IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| RONALD GARY, ) | Civil Action No. 4:06-2720-PMD-TER |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| OFFICER R. L. FLOYD AND THE GREENVILLE ) | |
| CITY POLICE DEPARTMENT, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

## I.  PROCEDURAL BACKGROUND

The plaintiff, Ronald Gary, filed this action under 42 U.S.C. § 1983[1] on September 28, 2006, alleging he was falsely arrested without probable cause. By order of the Honorable Patrick Michael Duffy dated January 3, 2007, plaintiff was instructed to file an amended complaint with the court within thirty (30) days. Plaintiff filed an "amend complaint" on January 25, 2007.  On June 21, 2007, defendants filed a motion for summary judgment along with supporting memorandum. (Doc. #32). Because the plaintiff is proceeding pro se, he was advised on or about June 22, 2007, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th. Cir. 1975), that a failure to respond to the defendants' motion for summary judgment with additional evidence or counter affidavits could result in dismissal of his complaint.  Plaintiff filed a response in opposition on July 16, 2007. (Doc. #39).

## III.  DISCUSSION OF ALLEGATIONS

In his complaint, Gary alleges that he was arrested pursuant to warrants obtained improperly

---

[1]All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d),DSC. Because this is a dispositive motion, the report and recommendation is entered for review by the District Judge.

by Detective Floyd of the Greenville Police Department on May 6, 2005, after erroneously being accused of forgery. Based on this erroneous information and warrants, plaintiff alleges he was incarcerated on September 26, 2005. As a result, plaintiff alleges that he was detained at the Greenville County Detention Center in excess of one year, was not allowed a personal recognizance bond, and was maliciously prosecuted. Plaintiff asserts that he was provided a power of attorney by his brother, Frank Gary, on February 16, 2004, while his brother was temporarily in a nursing home "without decision capacity" and that it had not been revoked. (Complaint). Plaintiff alleges that "the arrest was based on and determined as a result of erroneous information contained in the Police Reports submitted by the alleged victims in this case." (Complaint). Plaintiff asserts that Detective Floyd did receive a complaint from Ms. Vickie McCormick on April 27, 2005, identified as victim #1 and Mr. Frank Gary, the brother of plaintiff, was named as victim #2. Ms. McCormick filed a complaint asserting that plaintiff had forged his brother's signature, Frank Cary, on checks totaling $500.00 which were cashed at the Kash and Carry and returned by the bank as forged checks. Plaintiff asserts that Gary Floyd is his brother not his father as reported by Ms. McCormick. Further, plaintiff refutes the validity of the affidavits submitted to Detective Floyd asserting that his brother was mentally incompetent to sign such affidavits in December of 2004 indicating that his brother was "coerced" into signing the affidavits by unknown persons. Therefore, plaintiff alleges that Detective Floyd was negligent by not conducting an investigation in an effort to find probable cause to make an arrest and negligently proceeded to obtain five arrest warrants for five forged checks and falsely charging plaintiff with forgery. Plaintiff alleges that had Detective Floyd conducted an investigation, "he would have been aware of the true facts surrounding this case." (Complaint). Plaintiff asserts that on September 24, 2006, he was released as the forgery charges had been

dismissed on August 22, 2006. Plaintiff asserts that even though the charges were dismissed in August 2006, he was confined for an additional thirty (30) days when he should have been dismissed the day the charges were dismissed. Plaintiff requests compensatory and punitive damages.

Defendants filed a motion for summary judgment asserting Detective Floyd had probable cause at the time he swore out the arrest warrants at issue and that ample probable cause existed at the time of plaintiff's arrest. Defendant submitted affidavits and exhibits in support of the motion for summary judgment.

### IV.  SUMMARY JUDGMENT

A federal court must liberally construe pleadings filed by pro se litigants, to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972), and Haines v. Kerner, 404 U.S. 519 (1972).  In considering a motion for summary judgment, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried.  The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim,  Weller v. Department of Social Services, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists.   If none can be shown, the motion should be granted.  Fed. R. Civ. P. 56(c). The movant has the burden of proving that a judgment on the pleadings is appropriate.  Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing that there is a genuine issue for trial."  The opposing party may not rest on the mere assertions contained in the pleadings.  Fed. R. Civ. P. 56(e) and Celotex v. Catrett, 477 U.S. 317 (1986).

The Federal Rules of Civil Procedure encourage the entry of summary judgment where both parties have had ample opportunity to explore the merits of their cases and examination of the case makes it clear that one party has failed to establish the existence of an essential element in the case, on which that party will bear the burden of proof at trial. See Fed. R. Civ. P. 56(c). Where the movant can show a complete failure of proof concerning an essential element of the non-moving party's case, all other facts become immaterial because there can be "no genuine issue of material fact." In the Celotex case, the court held that defendants were "entitled to judgment as a matter of law" under Rule 56(c) because the plaintiff failed to make a sufficient showing on essential elements of his case with respect to which he has the burden of proof. Celotex, 477 U.S. at 322-323.

## V. ARGUMENT

As previously stated, defendants filed a motion for summary judgment. In their memorandum in support, defendants argue Detective Floyd had probable cause. Defendants submitted the affidavit of Vickie McCormick who attests that she is the previous owner of Kash and Karry grocery store in Greenville, South Carolina, which was sold in February 2005. McCormick attests that around late October early November 2004, a regular customer of Kash and Karry requested that they cash a check, made payable to Frank Gary, in the amount of one hundred ($100.00). McCormick states that "this gentleman's drivers license was verified and written down on the check he endorsed as Frank Gary." The check was cashed and $100.00 was paid to the gentleman. McCormick attests that over the course of the next several weeks, the same gentleman presented Kash and Karry with four other checks to cash, which made payable to Frank Gary in the amount of $100.00. McCormick asserts the five checks presented for payment, numbered 113505, 113613, 113950, 114071 and 114209,

totaled $500.00 and each were endorsed as Frank Gary. McCormick attests that she cashed at least one of the five checks and, during the transaction, the gentleman presented himself as Frank Gary and did not indicate that he was endorsing the check based upon a power of attorney he was given by Frank Gary. McCormick attests that the gentleman gave no indication to her that he was authorized to sign the check on behalf of Frank Gary and she cashed the check under the belief that the gentleman was Frank Gary. McCormick states that around the first part of 2005, she received a telephone call from a lady who indicated that she was a relative of Frank Gary and that he did not cash the five checks presented to Kash and Karry for payment. McCormick attests that the lady informed her that the person who obtained and cashed the checks was Ronald Gary, a relative of Frank Gary and that he did not have Frank Gary's permission to endorse the checks. McCormick asserts that several weeks later she learned from their bank, BB&T, that five hundred dollars had been charged against Kash and Karry's account due to the forgery of the five checks. McCormick attaches a copy of the five checks, the BB&T incoming collection letters for each of the five checks, and the corresponding affidavits of forgery to her affidavit. McCormick attests that she presented copies of these documents to the Greenville Police Department for prosecution of Ronald Gary. McCormick avers that she explained what had transpired to the detective assigned to investigate the forgery and informed him of her conversation with the relative of Frank Gary. McCormick attests that Kash and Karry was never compensated for the $500.00 but that Frank Gary was compensated for his loss due to the forgeries. (Affidavit, attachment A).

    Defendants submitted the affidavit of Detective Rick L. Floyd who attests he is a detective with the Greenville City Police Department and has been so employed for the past 15 years. Floyd asserts the is the officer assigned to investigate the forgeries at issue. Floyd attests that on or about

5

April 27, 2005, McCormick contacted the Greenville Police Department concerning five checks, including numbers 113505, 113613, 113950, 114071 and 114209, each made payable to Frank Gary in the amount of $100.00 and cashed at the Kash and Karry. Floyd attests that McCormick presented affidavits of forgery executed by Frank Gary concerning the five checks. (A copy of the affidavits of forgery are attached to the affidavit). Floyd attests that he spoke with McCormick on May 3, 2005, about the forgery and she explained that she and her husband were the owners of Kash and Karry grocery store and that a gentleman held himself out to be Frank Gary and endorsed five checks for them to cash totaling $500.00. Floyd attests that McCormick informed him that she learned that the person who endorsed the checks was not Frank Gary but was Ronald Gary. Floyd asserts that McCormick indicated that she believed Ronald Gary to be Frank Gary's son. Kash and Karry suffered a $500.00 loss, as charged against its bank account due to the forgery and that Frank Gary was compensated for his loss. Floyd attests that based on his investigation and the information submitted by McCormick, he prepared a warrant request concerning each of the five checks. On May 6, 2005, Floyd attests that he executed an affidavit concerning each of the five checks which accurately reflect his knowledge and investigation into the forgery of the five checks. Floyd attests that he presented the warrant request and affidavits to Greenville Municipal Court for consideration of whether or not probable cause existed to issue an arrest warrant against Ronald Gary for forgery of the five checks. Floyd states that he explained to the judge his investigation into the forgery and Judge Barksdale determined probable cause existed to arrest Ronald Gary. Floyd attests that after obtaining the arrest warrants for the forgery concerning the five checks, he closed his file in connection with this matter pending the arrest of Ronald Gary. Floyd attests that he was not involved in the decision by the Greenville County Solicitor's office to dismiss the forgery charges relating to

the five checks and that following the arrest of any suspect, the Greenville Police Department has no control relating to the decision, or timing of the decision, concerning a trial on pending case as the prosecution of the charges was left up to the solicitor's office. Further, Floyd attests that he received no indication during the course of his investigation that Ronald Gary may have endorsed the five checks based upon a power of attorney issued by Frank Gary. Floyd avers that he had thought there was even a remote possibility, he would have investigated the matter further before requesting the warrants. Additionally, Floyd attests that he received no indication that Frank Gary may have been incompetent when plaintiff executed the affidavits of forgery concerning the five checks. (Affidavit of Floyd).

      Defendants also submitted the affidavit of Sergeant Dana Lewis ("Lewis") who attests that she is a sergeant with the Greenville County Detention Center (GCDC) and has been so employed for more than thirteen years. Lewis attests that she is currently assigned as Population Management Sergeant at the Greenville County Law Enforcement Center (LEC) and has access to the records relating to the custody of inmates held at LEC. Lewis avers that she reviewed the records relating to the previous incarceration of plaintiff and sets out the following information from those records: On September 26, 2005, Gary was charged with driving under suspension-fourth offense and driving with a suspended license plate. On that date, Gary was booked on an outstanding arrest warrant for uttering a fraudulent check and five outstanding warrants for forgery, each count valued at less than $5000.00.

      On September 26, 2005, Gary was arraigned by a Greenville County Magistrate Judge and a Greenville City Municipal Judge on all pending charges. A bond was ordered on these charges. Lewis sets out the amount of the bonds in her affidavit and concludes that all charges, except the five

forgery charges, were later released via personal recognizance bond. However, Lewis notes plaintiff did not post bond on the five forgery charges. Lewis attests that plaintiff was convicted of driving under suspension fourth offense and sentenced to 90 days in jail and remained at the LEC to serve time relating to his conviction of driving under suspension-fourth offense because the sentence did not exceed 90 days. Lewis attests that on October 12, 2005, plaintiff was served with another warrant for uttering a fraudulent check. On November 1, 2005, Lewis avers that plaintiff's bond amount set for the five charges was reduced from $12, 5000.00 to $5000.00 but plaintiff did not post the bond on the five forgery charges. Lewis attests to the amount of time served upon each charge which will not be restated. (See Lewis affidavit). Lewis attests that based on the Greenville County Clerk of Court's records, it appears the Greenville County Solicitor's office notified the Clerk of Court on August 24, 2006, that the five counts of forgery had been dismissed due to the inability to locate the victims of the forgery. Lewis attests that the LEC was not informed of this dismissal until September 22, 2006, when the LEC received a fax from the Greenville County Solicitor's Office. Lewis attests that plaintiff was subsequently released from the custody of the LEC on September 24, 2006. (Lewis affidavit).[2]

In response to the motion for summary judgment, plaintiff asserts basically the same arguments as raised in his compliant. Plaintiff asserts that his brother was not competent to sign the affidavits of forgery and that detective Floyd was negligent in not investigating the allegations before requesting arrest warrants. Plaintiff alleges that as a result, he was arrested without probable cause.

---

[2] Defendants reattached a copy of Lewis' affidavit to their response in opposition to the motion to amend stating they had noticed the last page was inadvertently omitted when it was scanned and electronically filed with the motion for summary judgment. (Document #35).

## VI.  FALSE ARREST/PROBABLE CAUSE

Under the Fourth Amendment, an arrest is reasonable only if based upon probable cause. Rogers, 249 F.3d at 290 (internal citations omitted).  "Probable cause is 'defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the [suspect] had committed an offense." Id.  To determinate whether or not probable cause existed, we must examine the "totality of the circumstances" known to the officers at the time of arrest.  United States v. Al-Talib, 55 F.3d 923,931 (4th Cir. 1995).   The determination and existence of probable cause is a "practical, nontechnical conception," and it involves "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."  Brinegar v. United States, 338 U.S. 160, 175-76 (1949).  It will be found when "the facts and circumstances within an officer's knowledge – or of which he possesses reasonably trustworthy information – are sufficient in themselves to convince a person of reasonable caution that an offense has been or is being committed."  Wadkins v. Arnold, 214 F.3d 535, 539 (4th Cir. 2000). "Whether probable cause exists in a particular situation . . . always turns on two factors in combination: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct." Rogers, 249 F.3d at 290.   "Probable cause therefore could be lacking in a given case, and an arrestee's right violated, either because of an arresting officer's insufficient factual knowledge, or legal misunderstanding, or both."  Id.  Probable cause demands more than a mere suspicion, but less than evidence sufficient to convict.  Taylor v. Waters, 81 F.3d 429, 433 (4th Cir. 1996).  Our inquiry should be made based on the information possessed by the officer at the time of the arrest, that was then reasonably available to him at the time of arrest, and in light of any exigencies of time and circumstance that reasonably may have affected the officer's perceptions.  Pritchett, 973 F.2d at 312

(internal quotations omitted). While officers may not disregard readily available exculpatory evidence, failure to pursue such evidence, in and of itself, is not sufficient to negate probable cause." Wadkins, 214 F.3d at 541; Clipper v. Takoma Park, Maryland, 876 F.2d 17, 20 (1989). When probable cause to arrest existed even in the absence of county official's alleged misrepresentation in arrest warrant, no violation of constitutional rights occurred. Wilkes v. Young, 28 F.3d 1362, 1365 (4th Cir. 1994).

Based on the record, defendants had probable cause to arrest plaintiff. As set out in the discussion above, there was probable cause for defendant Floyd to request the warrants. It is undisputed that Kash and Karry suffered a loss of $500.00 due to plaintiff endorsing five checks made payable to Frank Gary; plaintiff endorsed these checks as Frank Gary; plaintiff failed to indicate on any of the checks that his endorsement was based upon any alleged power of attorney, plaintiff held himself out as Frank Gary when presenting the checks to Kash and Karry. Further, Frank Gary executed affidavits of forgery concerning the five checks stating that he did not sign or endorse the checks and did not authorize the placing of his signature on the checks. Additionally, McCormick explained to Detective Floyd her conversation with a relative of Frank Gary who indicated Ronald Gary had signed the checks without authority. (McCormick Affidavit). There were affidavits and a complaint with attachments as discussed above presented to Detective Floyd. Detective Floyd presented the information to the Municipal Judge who found probable cause to issue the warrants. Based on all of the above, the undersigned finds that there was sufficient evidence for the defendant to find probable cause to obtain the warrants that resulted in plaintiff's arrest.

## **QUALIFIED IMMUNITY**

Defendant Floyd asserts that he is entitled to qualified immunity from any liability in connection with his investigation of the five checks and his request for the issuance of arrest warrants against plaintiff for forgery pursuant to Harlow v. Fitzgerald.

Although the burden of showing immunity remains on the defendants, an early determination is desirable, since immunity provides complete protection from a lawsuit, including from extensive discovery or other preparation. When a defendant asserts that he or she is completely immune from suit, the court must consider whether the defense meets the standard set forth by various courts which have considered the issue. When a person is sued in his individual capacity, the court may consider whether that person is entitled to immunity from suit. Immunity is a defense to be asserted by the defendant and the burden of proving entitlement to immunity rests with the defendant asserting it. The defendants argue that they are entitled to qualified immunity in their individual capacity.

The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the court is to follow in determining whether the defendant is protected by this immunity. That decision held that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow, 457 U.S. at 818.

In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's conduct does not violate clearly established

> statutory or constitutional rights of which a reasonable person would have known. In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general of abstract level, but at the level of its application to the specific conduct being challenged. Moreover, the manner in which this [clearly established] right applies to the actions of the official must also be apparent. As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F. 3d 993 (4th Cir. 1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1985).

In Torchinsky v. Siwinski, 942 F. 2d 257 (4th Cir.1991), the Fourth Circuit Court of Appeals explained the rationale for Harlow qualified immunity:

> The grant of qualified immunity to government officials ensures that these officials can perform their duties free from the specter of endless and debilitating lawsuits. Without such immunity, the operations of government would be immobilized. Permitting damages suits against government officials can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties.

Torchinsky, 942 F.2d at 260-261. (Citations Omitted).

The Torchinsky court further noted that "a particularly appropriate procedure for determining an official's entitlement to qualified immunity is summary judgment." The Torchinsky court held that an official's entitlement to qualified immunity is based upon an "objective reasonableness" standard. "The very idea of reasonableness requires that courts accord interpretive latitude to officials judgments." Torchinsky, 942 F. 2d at 261, citing Sevigny v. Dicksey, 846 F. 2d 953 (4th

Cir.1988). Therefore, a plaintiff may prove that his rights have been violated, but the official is still entitled to qualified immunity if a reasonable person in the "official's position could have failed to appreciate that his conduct would violate" those rights. Torchinsky, 942 F. 2d at 261, citing Collinson v. Gott, 895 F. 2d 994 (4th Cir. 1990). As the Fourth Circuit explained in the case of Swanson v. Powers, 937 F. 2d 965 (4th Cir.1991), "[o]nly violations of those federal rights clearly recognized in existing case law will support an award in damages under 42 U.S.C. § 1983." 937 F. 2d at 967. Therefore, if a particular action by a state agency is deemed unconstitutional, the defendant is entitled to qualified immunity, unless there is clearly established case law demonstrating that the alleged conduct is violative of the Constitution.

In Maciariello v. Sumner, 973 F. 2d 295 (4th Cir. 1992), the Fourth Circuit Court of Appeals further explained the theory of qualified immunity when it set forth that:

> Governmental officials performing discretionary functions are shielded from liability for money damages so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Moreover, there are two levels at which the immunity shield operates. First, the particular right must be clearly established in the law. Second, the manner in which this right applies to the actions of the official must also be apparent. Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.

Maciariello, 973 F. 2d 295, 298 (4th Cir. 1992) (Citations omitted).

For a plaintiff to recover, he must show the defendants (i) violated a particular right clearly established in law, and (ii) the application of that right to the actions of the official must be apparent. The plaintiff in this case has not done so. The undersigned cannot conclude that the defendants in

this case "transgressed bright lines . . . officials are not liable for bad guesses in gray areas." Maciariello, supra. Therefore, the undersigned recommends that the motion for summary judgment filed by the defendants be granted on the basis of qualified immunity.

### D. RESPONDEAT SUPERIOR

The defendants assert that the Greenville Police Department cannot be held liable under §1983 under a theory of respondeat superior.

Under the doctrine of respondeat superior, an employer or supervisor is not liable for the acts of their employees, absent an official policy or custom which results in illegal action. See Monell v. Department of Social Services, 436 U.S. 658, 694 (1978) and Fisher v. Washington Metro Area Transit Authority, 690 F. 2d 1133, 1142-43 (4th Cir. 1982). The employer or supervisor may only be held liable if the plaintiff can show that they had actual knowledge of the specific danger, but were deliberately indifferent to the plaintiff's needs despite their knowledge of this danger, Slakan v. Porter, 737 F. 2d 368 (4th Cir. 1984).

In a §1983 action, a supervisor is not liable for the acts of an employee, absent an official policy or custom which result in illegal action. Monell, supra. A medical treatment claim is not appropriate against a superintendent/supervisor absent an allegation that he was personally connected to the treatment received. Vinnedge v. Gibbs, 550 F. 2d 926 (4th Cir. 1977). Supervisory liability requires that supervisory officials failed promptly to provide an inmate with needed medical care, deliberately interfered with a prison doctor's performance, tacitly authorized or were indifferent to prison physician's constitutional violation. Milter v. Beon, 896 F.2d 848 (4th Cir. 1990).

Defendant Greenville Police Department cannot be held liable under a respondeat superior

theory under Title 42, U.S.C. § 1983 for the acts of a subordinate employee. Monell, supra. Thus, it is recommended that all allegations against defendant Greenville Police Department be dismissed on this theory.

### E.  PENDENT JURISDICTION

Assuming plaintiff's § 1983 claim is dismissed by this Court and plaintiffs' complaint somehow can be conceived to state an additional claim for relief under any state common law theory, the undersigned concludes that such claim(s), if any, ought to be dismissed as well for want of jurisdiction. Specifically, this Court can decline to continue the action as to the pendent claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

### IX. CONCLUSION

For the above reasons, it is recommended that defendants' motion for summary judgment (document #32) be GRANTED.

Further, it is recommended that all outstanding motions be deemed MOOT.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

October 22, 2007
Florence, South Carolina

**The parties' attention is directed to the important information on the attached notice.**

15